UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DENNIS ATKINS,

    Petitioner,

                                              Case Number 07-14223

v.                                           Honorable Thomas L. Ludington

BLAINE LAFLER,

    Respondent.

_____/

## OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

Petitioner Dennis Atkins, presently confined at the St. Louis Correctional Facility in St. Louis, Michigan, filed a pro se application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was convicted by a jury in the Wayne County Circuit Court and sentenced to life imprisonment on one count of first-degree murder, Mich. Comp. Laws § 750.316, and a consecutive two-year prison term on one count of possession of a firearm in the commission of a felony, *id.* § 750.227b. Those convictions were affirmed on appeal, *id.*, and the Michigan Supreme Court denied leave to further appeal. *People v. Atkins*, 737 N.W.2d 725 (Mich. 2007). Petitioner had also been convicted of two counts of assault with intent to commit murder, but those convictions were vacated on appeal.

Petitioner raises two main claims in his habeas petition. First, Petitioner alleges that he was denied his right to compulsory process when the prosecutor failed to exercise due diligence in securing the presence of a witness, Tammy Weaver. Second, Petitioner contends that his trial counsel was ineffective for not either objecting to the admission of prior bad acts evidence against Petitioner or seeking a limiting instruction regarding this evidence. Respondent filed an answer to

the petition, asserting that the claims lack merit. For the reasons stated below, the petition for habeas corpus will be denied.

I

As summarized by the Michigan Court of Appeals, "Defendant's convictions arise from the shooting death of a 17-year-old victim, who died after receiving two close-range shotgun wounds, one to his left shoulder and one to his head, as he was lying on a stretcher and being treated by EMS technicians." *People v Atkins*, No. 268461, 2007 WL 1374485, at *1 (Mich. Ct. App. May 10, 2007). In his appellate brief, Petitioner summarized trial testimony as follows:

> Mr. Chulig was living in the area. On June 4, 2005, at approximately 3:00 a.m., he heard someone yell "Help me, Help me." He looked outside, noticed there was someone lying on the ground at the bottom of his driveway. He called 911. He saw the person get up, walk a short distance and then collapse. Within a few minutes, EMS arrived and began treating him. He stepped out onto his front porch. He heard and saw someone coming from the back of a nearby empty lot, heard the person say "Watch out." He saw a gun in the person's hand. He saw the EMS persons running away and saw the person shooting at the person lying on the gurney. He thought he heard two shots, went back in his house and called 911 again.
>
> The police arrived within a few minutes and told him to go inside and wait. He was later interviewed by them. The shooter was dressed in all black or dark blue, and had a hood up over his face. He could not identify the person. He identified several photographs of the area. He was approximately 10-15 feet away when he first saw the person, who collapsed approximately 40 feet away. He did not see the person point the weapon at anyone else.
>
> Mr. Hanna, EMS worker, responded with his partner, Mr. Peyton. He saw Mr. Rutledge on the ground, asking for help. He did not see anyone else in the area. He noticed a small caliber wound to the left lower flank. They stopped the bleeding, put him on a backboard, and put a cervical collar (c-collar) on him. They put him on the stretcher and as they were getting ready to lift the stretcher up, he heard a shotgun rack. He looked over his left shoulder and saw someone coming up to him with a shotgun. He heard the person say "Lookout." He ran and heard a shot. A short time later he heard a second shot. He hid along with his partner until the police arrived. After they arrived, he observed the patient was without vital signs, with a new injury to his head. He estimated the shooter was approximately 10 feet from him, that there were approximately 10 seconds between the shots. He ran because he did not want to get shot as well. He identified various photographs of the location, described the shooter as wearing black clothing, wearing a hood, and a black ski mask. The person was approximately 6 feet tall, slender build, with a brown skin tone.
>
> Ms. Bishop, girlfriend of Mr. Dawanne Sparks, was at Lakesha Spark's (her boyfriend's

sister) house in the early morning hours of June 4, 2005. She was awakened by Lakesha telling her someone was at the front door, whom she identified as defendant. Both women were acting nervous. Defendant asked to be let in. There was a white male with him whom she did not recognize. Defendant asked to spend the night. Defendant told the white person not to tell anyone that he was there, and that person left. Defendant and Lakesha went into the kitchen where they talked. Then both came into the bedroom where defendant told her and Dawanne that he had just gotten out of jail for carjacking, and he told the white man if he told anyone, he was going to kill him. Lakesha began asking questions. Dawanne tried to get him out of the room so they could get back to sleep. When defendant asked whether or not they had seen the news and told them how he had shot the person on the stretcher. She was both scared and sleepy, so she did not ask any questions. When Lakesha asked questions, defendant disrespected her. Defendant then left the room, cooked something to eat, took a shower, and fell asleep on the couch. A couple hours later, he woke them up, telling them he had to leave. She, defendant, and Dawanne left in the car; she got dropped off at the bus stop and the two left. Dawanne later picked her up from the bus stop after she got off of work. They went over to a house where she believed defendant lived. Defendant came out, telling Dawanne to wait. She got out and walked to the bus stop. Earlier, at work, she had talked to Lakesha about what had happened. Within the next day, she talked to police.

During the conversation at the house, defendant told her after he shot, he took his mask off, threw it away, and then came back to the scene. She had known defendant for approximately 2 years. She had met him through Lakesha. She also testified at a preliminary examination, as well as at an investigative subpoena hearing.

On cross examination, she admitted her testimony, including the date when defendant arrived, was different than what was contained in her statement to the police, which she gave on July 11, 2005, as well as her testimony at the hearing, which occurred two hours after her interview with the police.

. . .

Mr. Sparks, brother of Lakesha, had known defendant for two years. On June 9, 2005, he was at his sister's house when defendant arrived in the early morning hours. He was mad because he had been woken up. He could not get back to sleep because defendant and his sister were talking. Defendant had indicated that he had shot someone twice. He overheard the conversation between defendant and his sister. The next day, he was interviewed by the police, and also testified at the investigative subpoena hearing. Those statements were more detailed as to what defendant had said. He admitted that he did not want to be present at the trial. He had told his mother and Lakesha about a previous incident involving defendant pointing a gun at one of his friends, which happened several months previous. The next day, he dropped Ms. Bishop at the bus stop and took defendant to defendant's mother's house. He later dropped defendant's shirt and son off at the child's mother's house. At first, he did not believe what defendant told him, but because of defendant's actions and comments, he believed defendant was serious.

He admitted once, after the conversation at Lakesha's, his mother's boyfriend had pulled

-3-

a weapon on defendant while he was in a car with defendant and defendant's son. He later dropped defendant's son off at his mother's house. He admitted he had gone back to sleep after the conversation because he did not believe defendant.

. . .

Mr. Peyton, EMS worker, had also responded to the location in the early morning hours of June 4, 2005. They were treating Mr. Rutledge, who told him he had been shot. They put him on a backboard with a c-collar, and put the backboard on a stretcher. As they were getting ready to lift the stretcher, he heard a shotgun rack. He heard "Lookout" and saw someone coming up to his side. He described the person as a slender black man wearing a black ski mask, dressed all in black, carrying a shotgun at his waist. He backed away with his partner running down the street. He heard two shots, looked back and saw the patient roll off the backboard. He heard a third racking of the weapon, saw the person looking directly at his back. He ran a short distance up the street and made a distress call on his radio. He saw the gunman leave the area the same way he had come. Police arrived shortly and took off in the direction of the gunman. Other officers arrived and talked to him. When he went to check on Mr. Rutledge, he was dead. He described the gunman as a black male, no taller than 6 feet, and approximately 180 pounds. Although he believed defendant matched the description, he could not definitively say defendant was the shooter.

. . .

[On June 7, 2005, Defendant was arrested while driving a stolen vehicle.] . . . Because the person did not choose to prosecute, defendant was discharged on June 8, 2005.

. . .

On June 3, 2005, Mr. Session was at his niece's (Lateria Neal) house. Deceased was also present, having just gotten out of jail. A person he knew as "Sean" stopped by early in the morning, looking for deceased. He and deceased left. Early the next morning he learned deceased had been killed. He indicated Sean had taken his jacket at gunpoint earlier that summer, later returning it. He did not know defendant.

. . .

Mr. Pettway knew deceased, who was living with him. He knew deceased's mother, who had a substance-abuse problem, and knew deceased had worked at a collision shop. Deceased had talked to him concerning something he had seen at the shop, and expressed a fear of several persons including Larry Davidson, "Al Capone" (possibly Jamaal Thomas), and Sean (DeSean Neal). Deceased had told him what had happened at the shop, and the deceased had gone to jail. He never saw him again. These people had stopped by his house before deceased had gone to jail.

. . .

Ms. Cornett Sparks, mother of Lakesha, knew defendant through her daughter. On June 9th, based on her daughter's conduct and what had been told by her, she called the police, and met them at a restaurant. Later that same day, she saw defendant, and Mr. Sparks . . .

>    Defendant had been driving a vehicle with her son in the passenger seat.  She did not see a child in the car.  She admitted she had talked to her son, daughter, and Ms. Bishop regarding defendant, but denied she got together with them to put a murder case on him.
>
>    Ms. Lakesha Sparks knew defendant for two years and used to date him.  She was surprised when defendant arrived at her house on the morning of June 9, 2005, because she had moved and not told him her new address.  She had been sleeping when defendant appeared at a front window yelling to her.  She woke up Ms. Bishop and let defendant in the house.  Defendant started drinking and began telling her about the shooting.  When she started asking him questions, he began to disrespect her and told her to stop.  Defendant had told her that he had just got out of jail on a carjacking charge.  She asked her brother to take him from the house, which he did.  After defendant and her brother left, she talked to her mother, who called the police . . . Two days later, she, Ms. Bishop and her brother went to police headquarters to give a statement.  Later the same day, she testified at an investigative subpoena hearing.  She also testified at the preliminary examination.  During that night, defendant had been drinking alcohol and running off at the mouth.  On June 10, she saw defendant and her brother driving around in a car, stopping in front of her mother's house.  She saw her mother's boyfriend walk to the car.  After defendant got out of the car and left, she drove away.  Defendant's son was also in the car at the time. . . She admitted her testimony was different than the testimony at the investigative subpoena hearing.  She had expanded her information when she was interviewed a second time at police headquarters.
>
>    . . .
>
>    Officer McMillian . . . later determined Mr. Neal was killed on June 11, 2005, within hours of defendant's arrest.  In his opinion, both shootings were executions. . .

(internal citations omitted).

II

Petitioner is entitled to the writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits–

>    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court

arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410 (emphasis in original).  "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409.  "Furthermore, state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence." *Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004) (citing 28 U.S.C. § 2254(e)(1)).

A

First, Petitioner contends that he was denied his Sixth Amendment right to compulsory process when the prosecution failed to exercise due diligence in attempting to locate and produce an endorsed witness, Tammy Weaver, for trial.  About one month after the murder, Weaver contacted the Detroit Police, while she was incarcerated at the Dickerson Correctional Facility.  Weaver told the police that her boyfriend, Jamal Thomas, had told her that he and a man named DeSean Neal had killed the victim.  The prosecution had endorsed Weaver as a witness, but was unable to locate her at the time of trial.

The U.S. Supreme Court has explained that "more than mere absence of testimony is necessary to establish a violation of the right" of a defendant to have compulsory process for

obtaining witnesses in his favor. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 866 (1982). To establish a violation of the right to compulsory process, a defendant must make a plausible showing of how the witness' testimony would have been both material and favorable to the defense. *Id.* at 867. Additionally, the Compulsory Process Clause only requires that the prosecution "exercise due diligence in a good faith effort to secure the attendance of subpoenaed witnesses." *United States v. Baker*, 553 F.2d 1013, 1022 (6th Cir. 1977). In other words, it does not guarantee the "actual attendance" of a witness. *Id.* Likewise, in Michigan, "[a] prosecutor who endorses a witness . . . is obliged to exercise due diligence to produce that witness at trial." *People v. Eccles*, 677 N.W.2d 76, 83 (Mich. Ct. App. 2004). "Due diligence is the attempt to do everything reasonable, not everything possible, to obtain the presence of res gestae witnesses." *People v. George*, 342 N.W.2d 908, 910 (Mich. Ct. App. 1983).

Petitioner is not entitled to habeas relief on his compulsory process claim, because he has not demonstrated that the prosecution in this case did not exercise due diligence in a good-faith attempt at locating and serving Weaver with a subpoena for trial. In rejecting Petitioner's claim on direct appeal, the Michigan Court of Appeals noted the following:

> Testimony indicated that Tammy Weaver had a lengthy criminal history, including narcotics use and prostitution. She also had several aliases with different birthdates. She was released from jail on November 4, 2005, but her whereabouts were unknown at the time of defendant's trial in January 2006. A witness detainer, dated November 15, 2005, was issued for Weaver in another case, and the police were unable to locate her then. Consequently, her name was entered in the Law Enforcement Information Network (LEIN), so that the police would be notified if she was stopped by law enforcement for anything. Detroit Police Sergeant Ernest Wilson determined that phone numbers on file for both Weaver and Weaver's mother were no longer in service. Wilson searched for Weaver by twice visiting her last known address, and by investigating Weaver's neighborhood and other locations where she was known to attend. No one had seen her recently. Wilson also checked the jails and morgues in Macomb, Oakland, and Wayne counties, he checked whether Weaver was in federal custody, and he contacted the state of Ohio, where

>Weaver's mother lived. In light of this record, the trial court did not abuse its discretion in determining that Weaver could not be produced for trial, despite the exercise of due diligence. Accordingly, the prosecutor properly was excused from producing Weaver for trial.

*Atkins*, 2007 WL 1374485, at *1-2. Based on the same facts relied on by the Michigan Court of Appeals, this Court concludes that Petitioner is not entitled to habeas relief on his compulsory process claim.

B

Second, Petitioner contends that his trial counsel was ineffective for failing to object to evidence of Petitioner's other "bad acts" and for failing to request a limiting instruction. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-pronged test to determine whether a criminal defendant has received ineffective assistance of counsel. First, the convicted person must prove that counsel's performance was deficient, which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Second, the convict must show that counsel's deficient performance prejudiced him. Prejudice is established by a "showing that counsel's errors were so serious as to deprive the defendant of a fair trial." *Id.* The Supreme Court emphasized that a reviewing court should afford counsel great deference:

>Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent to making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action

might be considered sound trial strategy.

*Id.* at 689 (internal citations and quotations omitted).

The Supreme Court explained that to establish deficient performance, a habeas petitioner must identify acts that were "outside the wide range of professionally competent assistance." *Id.* at 690. To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In applying *Strickland*, the Sixth Circuit has stated that a reviewing court must focus on whether counsel's alleged errors "have undermined the reliability of and confidence in the result." *McQueen v. Scroggy*, 99 F.3d 1302, 1311 (6th Cir. 1996).

As summarized by Petitioner in his appellate brief, the following evidence of other "bad acts" was admitted at trial:

> . . . the jury was aware defendant had been arrested on a carjacking charge and later released because the complainant had not desired to prosecute. The prosecution called witnesses to testify as to the circumstances surrounding the carjacking incident: the arresting officer as well as the officer who later interviewed him.
>
> Several witnesses had testified defendant had told them he had just been released on carjacking charges. There was further evidence that he had told someone not to report a crime or he would kill that person. Additional evidence submitted at trial revealed either his possible involvement in or connections to several other offenses: the shooting of the owner of the collision shop, narcotics dealings, and the death of Mr. Neal. There was additional testimony concerning defendant being threatened with a weapon by Ms. Spark's boyfriend.

In rejecting Petitioner's ineffective assistance of counsel claim, the Michigan Court of Appeals noted that much of the evidence of Petitioner's alleged "bad acts" came from Petitioner's own statements to witnesses, which were admissible under Michigan law as statements of a party. *Atkins*, 2007 WL 1374485, at *2 (citing Mich .R. Evid. 801(d)(2)). The Michigan Court of Appeals

further noted that Petitioner had essentially conceded that much of the evidence that he complained about was relevant to giving the jury a complete picture of the events in question. Thus, the Michigan Court of Appeals determined that trial counsel was not ineffective for failing to object to admission of the "bad acts" evidence, which would have been admissible on other grounds. *Id.*

Generally, federal habeas courts " 'must defer to a state court's interpretation of its own rules of evidence and procedure' when assessing a habeas petition." *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005) (*quoting Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988)). Here, the Michigan Court of Appeals determined that the "bad acts" evidence challenged by Petitioner was admissible under Michigan law, and this Court must defer to that determination in resolving Petitioner's ineffective assistance of counsel claim. *See Brooks v. Anderson*, 292 F. App'x 431, 437-38 (6th Cir. 2008); *Adams v. Smith*, 280 F. Supp. 2d 704, 721 (E.D. Mich. 2003). Given the admissibility of the "bad acts" evidence under Michigan law, the Michigan Court of Appeals' determination that Petitioner was not denied the effective assistance of trial counsel because of counsel's failure to object to the admission of "bad acts" evidence was not contrary to, or an unreasonable application of, clearly established federal law. *See Pearl v. Cason*, 219 F. Supp. 2d 820, 828-29 (E.D. Mich. 2002).

Additionally, while this Court defers to the determination of the Michigan Court of Appeals, this Court agrees that the "bad acts" evidence of which Petitioner complains would have been admissible under Mich. R. Evid. 404(b). Background evidence, often referred to as *res gestae*, does not implicate the provisions of 404(b). *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000). Background evidence consists of other acts which are "inextricably intertwined" with the charged offenses or those acts, "the telling of which is necessary to complete the story of the charged

offense." *Id.* The Sixth Circuit has explained that:

> Proper background evidence has a causal, temporal or spatial connection with the charged offense. Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense.

*Hardy*, 228 F.3d at 748.

Generally, Petitioner challenges the testimony of several witnesses who testified that when Petitioner arrived at the house of two witnesses, he told them that he had just gotten out of jail on carjacking charges and that he had shot a man lying on a stretcher. According to witness testimony, Petitioner mentioned the carjacking arrest in the context of admitting to shooting the victim in this case. The reference to the carjacking formed an integral part of the testimony of the witnesses concerning Petitioner's admission to the shooting; thus, Petitioner has failed to show that such evidence would have been inadmissible under 404(b).

Likewise, testimony from a police officer that Petitioner was arrested after he was pulled over for driving a car that had been reported stolen was properly admitted as part of the description of Petitioner's arrest and therefore was not admitted in violation of 404(b). Although references to other crimes evidence is inadmissible, a prosecutor is entitled to explain the circumstances surrounding the investigation and arrest of the defendant. *See, e.g.*, *United States v. Stafford*, 232 F. App'x 522, 526-27 (6th Cir. 2007); *People v. Eaton*, 319 N.W.2d 344 (Mich. Ct. App. 1982).

Petitioner also complains about testimony from various witnesses that Petitioner had threatened to kill a person who was with him on the night in question if that person reported the crime. Although evidence of other crimes, wrongs, or acts is inadmissible to prove the character of the defendant, such evidence is admissible to prove consciousness of guilt. *See, e.g.*, *United States*

*v. Fortson*, 194 F.3d 730, 737 (6th Cir. 1999); *United States v. Callan*, 22 F. App'x 434, 444 (6th Cir. 2001). Likewise, evidence that a defendant threatened or intimidated a potential witness is also admissible under 404(b) as spoilation evidence to show consciousness of guilt. *United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986); *see also United States v. Manns*, 277 F. App'x 551, 558 (6th Cir. 2008); *People v. Abernathy*, 396 N.W.2d 436 (Mich. Ct. App. 1985).

Petitioner further complains about testimony from Dawanne Sparks, in which Sparks indicated that he had told his mother and his sister that he had witnessed Petitioner shoot another person in the past. Sparks, however, admitted that he did not want to be present at the trial and that his prior statements to the police and at an investigative subpoena hearing about Petitioner's admissions to him about the murder had been more detailed than his trial testimony. Evidence of a defendant's other crimes is admissible under 404(b) to explain why a witness refused to testify, because of a possible fear of retaliation from the defendant. *See United States v. Birdsong*, 330 F. App'x 573, 579-80 (6th Cir. 2009).

With regards to the remaining evidence, there was no basis for excluding it under 404(b), either because Petitioner was not clearly implicated in the involvement in these acts, or because Petitioner himself was the victim. In light of the foregoing, Petitioner has failed to establish that trial counsel was ineffective for failing to object to the evidence in this case.

Finally, even if a limiting jury instruction had been appropriate under Mich. R. Evid. 404(b), instructing the jury to consider the "bad acts" evidence for only certain purposes, exclusive of character or propensity to commit crimes, the Michigan Court of Appeals concluded that it may have been valid trial strategy on defense counsel's part to refrain from asking for a limiting instruction, so as to avoid emphasizing Petitioner's other bad acts to the jury. *Atkins*, 2007 WL 1374485, at *2.

*See Ferguson v. Knight*, 809 F.2d 1239, 1243 (6th Cir. 1987) (noting that "such instructions inevitably invite the jury's attention to matters the defendant normally prefers not to emphasize"); *Stamps v. Rees*, 834 F.2d 1269, 1276 (6th Cir. 1987) (finding that failure to request limiting instruction did not amount to ineffective assistance of counsel "as it was quite evidence that . . . counsel simply wanted to get past the prior convictions as quickly as possible without bringing undue attention to them"). Petitioner has failed to overcome the presumption that trial counsel's decision to not request a limiting instruction was a reasonable trial tactic to avoid giving undue attention to Petitioner's prior bad acts. Thus, Petitioner is not entitled to habeas relief on his ineffective assistance of counsel claim.

III

Based on the foregoing, the Court will deny the petition for a writ of habeas corpus. The Court will also deny a certificate of appealability to Petitioner. In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484.

A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States*, 310 F.3d 900, 901 (6th Cir. 2002). For the reasons stated in this opinion, the Court will deny Petitioner a certificate of appealability because

he has failed to make a substantial showing of the denial of a federal constitutional right or that the procedural ruling is debatable. The Court will also deny Petitioner leave to appeal in forma pauperis, because the appeal would be frivolous.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus [Dkt. # 1] is **DENIED**.

It is further **ORDERED** that a certificate of appealability is **DENIED**, and that Petitioner is **DENIED** leave to proceed in forma pauperis on appeal.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: November 5, 2009

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 5, 2009.

s/Tracy A. Jacobs
TRACY A. JACOBS